UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| AJIT "BOBBY" SOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TEMPUR SEALY | ) | CIVIL ACTION NO: 1:19-CV-_____ |
| INTERNATIONAL, INC., | ) | |
| a Kentucky corporation; | ) | |
| GARY FORD, an individual; | ) | |
| CODY HAVAICH, | ) | |
| an individual; and | ) | |
| SARAH EAST, an individual | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT AND JURY DEMAND

**NOW COMES** the Plaintiff, Ajit "Bobby" Sood (hereinafter "Plaintiff"), by and through undersigned counsel, and hereby files this Complaint for relief against Defendants, Tempur Sealy International, Inc. (hereinafter "Sealy"), Gary Ford (hereinafter "Mr. Ford"), Cody Havaich (hereinafter "Mr. Havaich") and Sarah East (hereinafter "Ms. East") (all Defendants hereinafter referred to collectively as "Defendants"), and alleges and states as follows:

## NATURE OF THE ACTION

1. This Complaint arises from the Defendants' unlawful termination of Plaintiff's employment, the Defendants' discrimination against the Plaintiff based on his disability, the Defendants' unlawful harassment of the Plaintiff, the Defendants' violation

1

of the Americans with Disabilities Act ("ADA"); the Defendants' denial of a good faith interactive process; the Defendants' unlawful retaliation; the Defendants' denial of a reasonable accommodation; the Defendants' discrimination against the Plaintiff based on his national origin, the Defendants' discrimination against the Plaintiff based upon ancestry and ethnic characteristics (Indian); the Defendants' discrimination against the Plaintiff by way of racial name-calling; the Defendants' denial of a work environment free from discrimination; the Defendants' unlawful reprimand of the Plaintiff for alleged unsatisfactory and poor job performance as a pretext for unlawful termination; the Defendants' unlawful denial of the Plaintiff's reinstatement; the Defendants' retaliation against the Plaintiff for engaging in the protected activity of complaining about the unlawful discrimination and the Defendants' unlawful discrimination against the Plaintiff for reporting a work-related injury.

2.      More specifically, the Plaintiff brings this action for discrimination, retaliation and unlawful termination based upon his national origin, ancestry, and ethnicity (Indian) pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, as amended ("Title VII"); Title I of the Civil Rights Act of 1991 (Pub. L. 102-166), 42 U.S.C. §1981a, *et seq.*, ("CRA"); Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et seq.* ("ADA"); the ADA Amendments Act of 2008, 42 U.S.C. §12101, *et seq.* ("ADAAA"); and Section 504 of *the Rehabilitation Act* of 1973, 29 U.S.C. §794 *et seq.* ("Rehab. Act").

3.      This action is also brought under common law and statutory state law for wrongful discharge, intentional and negligent infliction of emotional distress, and violation

2

of the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-240, *et seq*.

4. The unlawful and injurious practices alleged herein include, but are not limited to, harassment, the unequal application of discipline and discharge based on national origin, ancestry, ethnic characteristic, disability and retaliatory motives.

5. Plaintiff seeks actual and compensatory damages; liquidated damages; punitive damages; equitable relief, specifically including prospective equitable relief against all Defendants; future loss of income due to loss of reputation; past and future medical expenses; attorneys' fees; costs of litigation; and any other damages available by law.

## JURISDICTION AND VENUE

6. This action is brought, in part, pursuant to Title VII and CRA for discrimination based on race and national origin and, in part, pursuant to the ADA and ADAAA for discrimination based on disability.

7. Subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1343(3), 1343(4), and 42 U.S.C. §2000(e)-(2)(a). This court also has jurisdiction under 42 U.S.C. §1981 *et seq*.; 42 U.S.C. 12101*, et seq.;* and 29 U.S.C. § 794 *et seq.*

8. This Court has supplementary subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form a part of the same case or controversy as the federal claims.

3

9.      Venue is proper in the United States District Court for the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within the Middle District of North Carolina. Venue lies with this Court pursuant to 28 U.S.C. §1391(b).

10.     Venue is proper pursuant to 42 U.S.C. §2000(e)-(2)(a) because the unlawful employment practices are alleged to have been committed within the Middle District of North Carolina.

## THE PARTIES

11.     Plaintiff, Ajit "Bobby" Sood, is an East Indian by ethnicity, ancestry and national origin. He was born and raised in India. He is a male, naturalized citizen of the United States of America, and, all times relevant herein, a resident of Forsyth County, North Carolina.

12.     At all times relevant herein, Defendant Tempur Sealy International, Inc. (hereinafter referred to as "Sealy") is and has been a Kentucky corporation with its principal place of business located in Lexington, Kentucky, and regularly does business in the State of North Carolina. Sealy has a production and R&D unit located at 239 Sealy Dr, Trinity, NC 27370. It thus has sufficient minimum contacts with North Carolina to render the exercise of personal jurisdiction over it proper.

13.     At all times relevant herein, Defendant Gary Ford was and is a natural person, works as a Vice President with Sealy, and is an officer/agent of Sealy.

4

14.     At all times relevant herein, Defendant Cody Havaich was and is a natural person, works as a product engineer with Sealy, is an officer/agent of Sealy, and was Plaintiff's supervisor.

15.     At all times relevant herein, Defendant Sarah East was and is a natural person, works as a human resource manager with Sealy, and is an officer/agent of Sealy.

16.     At all times pertinent to this action, all Defendants acted as Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e, 42 U.S.C. § 12111(5), and the common law of North Carolina.  Accordingly, as stated above, unless otherwise specified, the Defendants will be collectively referred to herein as "Defendants."

17.     At all times relevant herein, Sealy has continuously done business in North Carolina, and continuously employed at least five hundred (500) employees nationwide, and more than fifteen (15) employees in North Carolina.

18.     At all relevant times herein, Sealy (including, but not limited to, its CEO, Human Resources department and Legal department) was and has been aware of the unlawful discrimination and retaliation alleged herein and has refused to take adequate steps to investigate and remedy such unlawful conduct.

19.     At all relevant times herein, each Defendant was the agent, servant, employee, of all other Defendants and was acting within the scope of agency and/or employment, with the knowledge, consent, or ratification of each of the other Defendants in doing the things alleged in this complaint. All Defendants are jointly and severally liable for Plaintiff's damages.

5

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

20.     Plaintiff has fulfilled all requisite conditions precedent to the institution of this action under 42 U.S.C. §2000(e). He timely filed charges with the United States Equal Employment Opportunity Commission (hereinafter "EEOC") and the North Carolina Department of Labor (hereinafter "NCDOL") and has received Right to Sue Letters. This lawsuit is filed within 90 days from the date of receipt of the Right to Sue Letters.

## STATEMENT OF FACTS

21.     The 51-year-old Plaintiff is a resident of Forsyth County, North Carolina. He was born and raised in India. The Plaintiff excelled in math and science in school in his competitive, native India and received his B.E. in Mechanical Engineering in 1990 from Punjab University in India.

22.     From 1990 until 2019, the Plaintiff worked for various multinational companies in Japan, South Korea, the United Kingdom, and the United States.

23.     During his 29-year career as a qualified Mechanical Engineer, Plaintiff has never suffered such hostility, discrimination, retaliation, and ridicule as he suffered during his employment with Sealy.  Plaintiff has never before had to file a lawsuit, complaint and/or petition against any employer.

24.     On April 12, 2016, Plaintiff interviewed for a job as a Senior Product Engineer ("SPE") for Sealy. Immediately after the interview, because Plaintiff possessed the required qualifications, experience and skills, he was offered a position as an "independent contractor" with $96,000 per annum wages, but not including benefits.

6

25. On March 17, 2017, after 11 months of working for Defendant Sealy, he was promoted to a full-time position. He was given a salary raise to $100,000, a bonus of $8,000, and full benefits. Thus, his total salary, including benefits, was raised from $96,000 to approximately $130,000. It is worth noting that such a substantial raise is not generally given unless an employee demonstrates exemplary and outstanding performance.

26. On March 5, 2018, Plaintiff received a bonus in the amount of $6,667 for his good work and excellent performance during 2017.

## Facts Concerning Discrimination Based On National Origin, Ethnicity And Ancestry

27. On January 6, 2018, Renee Smith, Senior Quality Engineer ("SQE"), scheduled her retirement for March 31, 2018. Mr. Havaich called Plaintiff into his office and said that the Management would then require, in additional to Plaintiffs' existing duties as SPE, that Plaintiff take over the job duties of SQE upon Ms. Smith's retirement. The Plaintiff was required to perform the job duties of two employees. Hence, the Plaintiff was assigned dual job duties while only being compensated for one job.

28. Thus, in addition to his duties as SPE, the Plaintiff was assigned the job duties of SQE. This doubled Plaintiff's workload. This caused Plaintiff enormous amounts of stress, fatigue and exhaustion.

29. The Defendants did not hesitate to double the Plaintiff's job duties based upon improper stereotypes and, astonishingly, freely admitted it. Mr. Havaich told the Plaintiff that "Indian people" are accustomed to doing several jobs and, because the

7

Plaintiff was Indian and a senior (older), he would have to perform dual jobs. Caucasian and American engineers were not assigned additional job duties.

30.     Because his dual job duties were very strenuous and were adversely affecting Plaintiff's health, the Plaintiff continuously requested the reasonable accommodation that Mr. Havaich reduce his workload, both in person and by email.  Mr. Havaich disregarded Plaintiff's concerns and directed Plaintiff to continue performing dual jobs based on the imprudent and nonsensical belief that "Indian people" are somehow genetically built to perform two jobs.

31.     Mr. Havaich relentlessly forced the Plaintiff to perform dual job duties. Mr. Ford, the manager of quality control, assigned SQE tasks to Plaintiff and Mr. Havaich, the manager of production, assigned SPE duties to Plaintiff. Mr. Havaich and Mr. Ford did not take into consideration the Plaintiff's deteriorating health due to overburdensome work and summarily rejected the Plaintiff's continued requests for accommodation.   The Plaintiff, in order to keep his job, dutifully continued to perform the work of two people.

32.     Ultimately, Plaintiff became sick and disabled because of the excessive workload that he was assigned to do. His job duties included his own duties as a SPE and the duties of Rene Smith's SQE position which fell vacant when she retired March 31, 2018. A new employee was never hired to fill that vacancy. Instead, Plaintiff was directed to perform both jobs with no additional consideration.

### Facts Concerning Harassment Based on Race

33.     Mr. Havaich indulged in racial name-calling and ridiculed the Plaintiff on the basis of his national origin, ethnicity and ancestry (Indian). The Plaintiff's nickname

is "Bobby." Mr. Havaich constantly hurled insults at the Plaintiff, calling the Plaintiff "KeBob" and "KeBobby" – distasteful references to the Indian food Kabab. He commented that the Plaintiff should open a restaurant called KeBobby's.

**Facts Concerning Discrimination And Retaliation Based On Disability.**

34. The Plaintiff continuously requested, in person and through emails, that Mr. Havaich reduce his workload – a reasonable accommodation. The excessive workload was causing excessive stress and fatigue for Plaintiff. As a result, Plaintiff suffered a work-related physical injury on or about October 15, 2019.

35. On or about October 15, 2018, Plaintiff was in great pain and went to see his doctor, Richard Herber, M.D. Dr. Herber noted that "Ajit Sood may return to light duty immediately with the following restrictions: Please reduce the workload stress for this patient. He has a medical condition that has [sic] can be seriously impacted and could worsen if the patient's stress is high."

36. On October 24, 2018, Dr. Herber noted, "I am currently treating Mr. Sood for [a] medical condition that unfortunately is being adversely affected by his current work load/stress level due to his job responsibilities of both his senior product engineer position and his recently added responsibilities as supplier quality engineer. I would ask that you/your company consider reducing his workload (eg. [sic] No overnight travel for 30 days, no physical exertion/heavy lifting over 20 lbs for next 30 days), and hire another person to relieve the work load of both positions. . . . It is my medical opinion that the patient's medical condition could worsen and affect his full recovery if he continues to work in these two positions."

9

37.    Despite the restrictions, Mr. Havaich willfully ordered Plaintiff to unload heavy mattresses from a truck parked at the shipping dock. These mattresses were several hundred pounds and were contaminated by substances including blood, urine, mold, and dirt.

38.    This work caused further bodily injury to Plaintiff, including a wound that required a tetanus shot and antibiotics, which in turn caused Plaintiff further physical illness. Defendants still continued to assign Plaintiff the job duties of both SPE and SQE. Plaintiff's workload was not reduced. Plaintiff was not provided accommodation for his disability.

39.    On November 26, 2018, Dr. Herber advised Plaintiff that he could return to work on November 27, 2018, but that his work restrictions should continue for an additional 30 days. Dr. Herber referred Plaintiff to a specialist to further evaluate his condition.

40.    Also, in November 2018, Plaintiff informed Mr. Havaich that he intended to file a worker's compensation claim relating to his injury and subsequent resulting illness. After Mr. Havaich received this news, he responded by further increasing Plaintiff's workload.

41.    While Plaintiff's health condition was still poor, Defendant East reprimanded Plaintiff for allegedly failing to perform his job duties.  In the letter dated November 30, 2019, Ms. East erroneously claimed that the Plaintiff failed to perform some of the basic SPE functions. She specifically referred to three projects that were assigned to Plaintiff: 1) PE Core Team Member for Heavenly; 2) CaCO3 Audit; and 3) Emerging

10

Channels Packaging Testing. The reprimand was based on false allegations by Mr. Havaich.

42.     Prior to issuing the reprimand on November 30, 2019, Ms. East did not give the Plaintiff an opportunity to explain his performance in the SPE role or "show cause" as to why he should not be reprimanded. Ms. East acted on the directions of Mr. Havaich, who was already preparing to eventually terminate Plaintiff.  Ms. East also failed to follow Sealy's "Open Door Policy." This policy is designed to foster equitable treatment and problem solving.

43.     In fact, most, if not all of the allegations in the reprimand letter were based on false statements and facts. This reprimand was designed as groundwork for Plaintiff's termination because Plaintiff was now considered a "lame horse" because of his disability.

44.     On December 20, 2018, Plaintiff submitted a detailed reply to the November 30, 2018 reprimand letter. In his reply, Plaintiff explained that the allegations in the reprimand letter were false and, in fact, attributable to Mr. Havaich. Specifically, the failure of the packaging project, for example, was attributable to Mr. Havaich, not the Plaintiff or any other engineer. After many hours spent on this project, the project was rejected.  Plaintiff, from the very beginning, cautioned Mr. Havaich that the project was not feasible, was uneconomical, and was a waste of time and labor.  Thus, Plaintiff was wrongly reprimanded for decisions attributable solely to Mr. Havaich. The Plaintiff was a target and scapegoat.

45.     Plaintiff was never reprimanded before he became disabled.

11

46.     From April 2016 to December 2017, the Plaintiff performed the standard job duties of an SPE and performed well.  Although he was subjected to racial harassment, he muddled through.  However, beginning in October 2018, when Plaintiff suffered a work-related injury, everything changed.  Plaintiff was no longer appreciated, and Mr. Havaich started taunting him. Ms. East, Mr. Havaich, and Mr. Ford worked together to prepare groundwork for Plaintiff's termination, on the pretext that his work was not satisfactory. This is inconsistent with Plaintiff's promotion in 2017. Furthermore, Plaintiff's performance only began to be rated unsatisfactory after he suffered a work-related injury. These facts indicate a discriminatory and retaliatory motive behind his unfavorable reviews after becoming disabled.

47.     On or about January 16, 2019, Dr. Herber permitted Plaintiff to return to work.

48.     On or about February 11, 2019, Plaintiff had a meeting with Ms. East. During the meeting, Ms. East admitted to Plaintiff that Mr. Havaich and Mr. Ford were reprimanded by management for their inappropriate behavior with employees and were sent for three months of training regarding workplace propriety.

49.     On February 13, 2019, the Plaintiff sent an email to Ms. Ford stating that, despite his recovery from work related illness, his harassment continued. The Plaintiff was still assigned dual job duties and his stress level had not decreased.

50.     On March 6, 2019, the Plaintiff filed a complaint with the EEOC because of the unlawful harassment and hostility he suffered from the Defendants.

51.     On March 7, 2019, the Plaintiff informed Ms. East that he filed a complaint with the EEOC and the North Carolina Department of Labor.

52.      Tellingly, the very next day, March 8, 2019, Ms. East put Plaintiff on a Performance Improvement Plan ("PIP"). The timing of the issuance of the PIP indicates a retaliatory motive. This was also the second step to prepare groundwork for Plaintiff's termination, the first step being the reprimand letter dated November 30, 2019.

53.     Notably, in the PIP Plaintiff was advised to improve his performance as SPE and not SQE, the position for which he was hired.  In Plaintiff's 2018 annual performance review (which was also handed to him on March 8, 2019), no performance issues were raised concerning his performance as an SQE.  Plaintiff became apprehensive of Mr. Havaich's and Ms. East's actions toward Plaintiff, as their demeanor had changed.  All the projects noted in the PIP (CaCO3, PPC funnel Project and E-Comm Packaging) were previously addressed by Plaintiff in his December 20, 2018 letter, in which Plaintiff explained that they failed because of Mr. Havaich's actions and failure to heed Plaintiff's concerns.  This evidences Mr. Havaich's tendency to shift blame to others, specifically those who disagree with him.

54.     During a meeting, Plaintiff argued that the PIP plan was based on false claims and was retaliatory.  Mr. Havaich agreed to withdraw the PIP.

55.     On March 20, 2019, Plaintiff suffered another occupational injury while he was tearing down used hazardous mattresses in Kansas City.  Plaintiff also suffered GI symptoms and anxiety due to excessive stress and harassment by Mr. Havaich. Plaintiff had previously experienced GI symptoms in October 2018, but they had subsided by

13

January 2019. These new GI symptoms occurred because of Plaintiff's stressful dual job duties.

56. On March 27, 2019, Dr. Herber ordered that the Plaintiff limit himself to light duty, with no heavy lifting and no travel. Meanwhile, Plaintiff's health condition worsened, and he was referred to a psychiatrist for sleeplessness, loss of appetite, adjustment disorder, and anxiety. On March 28, 2019, a psychiatrist, Dr. Marshall, examined the Plaintiff. He declared the Plaintiff to be fully disabled and ordered that he be released from work due to work-related illness. Plaintiff did not work from March 28, 2019 until June 10, 2019 based upon Dr. Marshall's orders.

57. On June 10, 2019, the Plaintiff resumed his duties with restrictions. On June 13, 2019, only days after he returned from protected leave, the Plaintiff was threatened with termination because of alleged and pretextual "poor performance."

58. On June 28, 2019, Plaintiff was terminated while he was disabled, needed and requested accommodation, and was receiving medical treatment related to his disability. There was not a discussion as to accommodation.

59. Plaintiff's PIP issued was on March 8, 2019 and the Plaintiff was given sixty (60) days to show improvement. On March 27, 2019, Plaintiff again fell sick due to the work environment with Defendants when Dr. Marshall ordered him to rest completely and refrain from work. Sixty days, excluding the time on which Plaintiff was on medical leave, had not yet elapsed since the date Plaintiff was put on a PIP. In fact, Plaintiff worked only approximately 38 days on the PIP before he was terminated.

## Facts Concerning Negative Annual Performance Review

60.    The 2018 annual performance review was given to the Plaintiff on March 8, 2019, just one day after Plaintiff made a complaint to the EEOC and after Mr. Havaich was aware of Mr. Sood's intention to file a worker's compensation claim. Thus, the 2018 annual performance review was tainted with retaliatory motive and discriminatory intent.

## FIRST CAUSE OF ACTION
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## DISCRIMINATION BASED ON RACE/NATIONAL ORIGIN

61.    Plaintiff realleges by reference each and every allegation contained in the above Paragraphs and incorporates the same herein.

62.    42 U.S.C. § 2000e-2 provides:

(a)    Employer practices. It shall be an unlawful employment practice for an employer…

> (2)  to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's **race**, color, religion, sex, or **national origin.** *[emphasis added]*

42 U.S.C. § 2000e-2.

63.    Plaintiff is East Indian by ancestry, race, descent, national origin and ethnicity.  His first language is Hindi and his second language is English. Plaintiff was born and grew up in India. He completed all schooling, including university, in India.

64.    Defendants Havaich and East treated Plaintiff differently and less favorably than similarly situated employees who were Caucasian or were Americans by descent, ancestry and national origin.

15

65.     Plaintiff was singled out by his physical appearance. Plaintiff was harassed, ridiculed and subjected to racial taunting. In addition, Plaintiff was assigned more work compared to similarly situated employees, which his supervisors rationalized based on his race, national origin, ancestry, and ethnicity. Discriminatory intimidation, ridicule and insults permeated the work environment, and were sufficiently severe to alter the conditions of Plaintiff's employment and to create an abusive and discriminatory working environment as detailed herein.

66.     Plaintiff was targeted for harassment and subjected to a discriminatory work environment by managers and supervisors.

67.     In violation of Title VII, Defendants violated Plaintiff's right to enjoy all the benefits, privileges, terms and conditions of employment and contractual relationship with Defendant Sealy.

68.     Defendants have a history of discrimination against minority races. *See* Gabriel Sanchez, *Sealy of Minnesota Agrees to Pay $175k Over Racial Harassment at St. Paul Plant*, STAR TRIBUNE (Apr. 22, 2017, 2:45 PM), http://www.startribune.com/sealy-of-minnesota-settles-dispute-over-racial-harassment/420130363/; *Violation Tracker Individual Record*, GOOD JOBS FIRST, *at* https://violationtracker.goodjobsfirst.org/violation-tracker/-sealy-inc (last visited Dec. 10, 2019).

69.     Plaintiff was made to suffer and continues to suffer irreparable injury to his health and psyche. Plaintiff has also suffered monetary damages as a result of

discrimination by Defendants, including lost past and future wages and decreased future earning potential.

## SECOND CAUSE OF ACTION
## VIOLATION OF TITLE I OF THE CIVIL RIGHTS ACT OF 1991
## EMPLOYMENT DISCRIMINATION BASED ON RACE

70.     Plaintiff realleges by reference each and every allegation contained in the above Paragraphs and incorporates the same herein.

71.     Defendants' acts complained of above effectively deprived Plaintiff of equal employment opportunities as an employee because of disparate treatment through the assignment of more work because of his race without increased compensation, discriminatory harassment and slander, and retaliation for his complaints of discrimination in violation of Title I of the Civil Rights Act of 1991 (Pub. L. 102-166), 42 U.S.C. §1981a, *et seq*., ("CRA").

72.     The CRA provides the right to recover punitive damages for an employer's unlawful, intentional discrimination.

73.     Plaintiff did not engage in any improper conduct alleged by Defendants in the written disciplinary coaching; in the fabricated PIP; and in the negative performance review which was handed to Plaintiff after his complaint to the EEOC.

74.     As a direct and proximate result of Defendant's illegal conduct, Plaintiff incurred monetary damages, emotional distress, humiliation and loss of reputation.

## THIRD CAUSE OF ACTION
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND TITLE I OF THE CIVIL RIGHTS ACT OF 1991
## RETALIATION BASED ON PROTECTED ACTIVITY

75.     Plaintiff realleges by reference each and every allegation contained in the above Paragraphs and incorporates the same herein.

76.     Plaintiff engaged in "protected activity" by notifying his managers and filing complaints based on the discrimination he experienced. Plaintiff also engaged in "protected activity" by participating in the EEOC complaint process. Plaintiff and another African American employee, Ms. Kim Oliver, complained to the managers and EEOC because of the discriminatory conduct of certain supervisors.

77.     Plaintiff's EEOC complaint alleged discriminatory treatment based on national origin, disability, and failure to provide accommodation.

78.     As a result of Plaintiff's complaint to the EEOC, Defendants retaliated by subjecting Plaintiff to an "adverse employment action," including, but not limited to:

a.      Baseless and unnecessary disciplinary coaching of Plaintiff, which was a pretext for his termination;

b.      Fabricating false allegations of "poor performance" to prepare the groundwork for termination;

c.      Directing Plaintiff to perform the duties of two employees because he was of Indian descent and ancestry, causing Plaintiff excessive fatigue, stress and injury;

d. Expressing threats to Plaintiff that he would be terminated if he continued to make any type of complaints about defendant Sealy's failure to investigate or otherwise address his prior complaints;

e. Fabricating a negative annual performance review of Plaintiff in retaliation for Plaintiff engaging in protected activity; and

f. Terminating Plaintiff's employment on the pretext of poor performance.

79. Plaintiff would not have suffered these "adverse employment actions" in the absence of his protected conduct.

80. Defendant Sealy, through its agents or supervisors, engaged in a pattern and practice of unlawful retaliation by subjecting Plaintiff to harassment, slander, reprimand, and termination.

81. Plaintiff did not engage in any improper conduct alleged by Defendants in the written disciplinary coaching; in the fabricated PIP; and the negative performance review which was handed to Plaintiff after his complaint to the EEOC.

82. Plaintiff was subjected to disparate treatment through discipline and discharge in violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 12101, *et seq.*, Title I of the Civil Rights Act of 1991 (Pub. L. 102-166), 42 U.S.C. §1981a, *et seq.*, and 29 U.S.C. § 794.

83. As a result of the hostile, offensive and discriminatory conduct perpetrated by Defendants and Sealy's failure to protect Plaintiff from harassment, ridicule and disparate treatment by its supervisors and managers, Plaintiff has suffered emotional

19

distress, mental anxiety and irreparable loss of his previously unblemished employment record.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990,**
**42 U.S.C. § 12101, *et seq.* and ADA Amendments Act of 2008,**
**42 U.S.C. § 12101, *et seq.***
**HOSTILE WORK ENVIRONMENT**

84.     Plaintiff realleges by reference each and every allegation contained in the above Paragraphs and incorporates the same herein.

85.     Plaintiff is within the ADA's protected class pursuant to 42 U.S.C.

§ 12102 because he has physical and mental impairments that substantially limit his ability to engage in at least one daily activity; he has a record of such impairment; and he was, at all times relevant, perceived by Defendant Sealy and its managers, supervisors, and employees to have such an impairment.

86.     Plaintiff was discriminated against because of his disabilities. Sealy failed to accommodate him pursuant to the recommendations of heath care professionals, and he was terminated because he complained about the disparate treatment he experienced.

87.     Plaintiff suffered a materially adverse employment action when he was reprimanded and ultimately terminated.  But for Plaintiff's complaints, ongoing retaliation for Plaintiff's disabilities against him would likely not have occurred. In addition, Defendants refused to provide accommodation to Plaintiff.

88.     All of this conduct was and is in violation of the ADA and ADAAA.

89.     Defendants, collectively and individually, subjected Plaintiff to disparaging treatment, a hostile work environment, and harassment.  Defendants adopted adversarial

20

attitudes and hostile demeanors toward Plaintiff. This harassment was frequent, severe, and pervasive, and continued unabated until Plaintiff's discharge by Defendants on June 28, 2019.

90.　　The harassment and discrimination were unwelcome to Plaintiff.

91.　　This hostile work environment unreasonably interfered with Plaintiff's ability to perform his job duties by disrupting his relationship to his employer Sealy and its management.

92.　　Plaintiff's protected activity of complaining about disparate treatment and discrimination flowed directly from Defendants' failure to take prompt and effective action to stop the hostile work environment, requiring Plaintiff to spend many hours on otherwise unnecessary grievance processes and other means of seeking relief, amongst other encumbrances.

93.　　Plaintiff personally experienced harmful effects of the hostile work environment alleged herein. For instance, Plaintiff felt humiliation and despair as a result of his reasonable fear of continued harassment.

94.　　Multiple events contributing to the development of this hostile work environment occurred within the 180-day period prior to Plaintiff's first relevant EEOC charge.

95.　　Plaintiff perceived the working environment to be abusive and hostile.

96.　　Plaintiff exhausted his administrative remedies by filing his ADA complaint with the EEOC, generating EEOC case numbers 435-2019-00474 and 473-2019-01403. He received the 90-day right-to-sue notices on September 24, 2019 and October 30, 2019.

This lawsuit in federal court is filed within the 90-day period, i.e. before December 23, 2019.

97.     As a direct and proximate result of Defendant's illegal hostile work environment, Plaintiff incurred damages including, but not limited to, lost income and benefits, humiliation, loss of enjoyment of life, emotional distress, damage to his previously unblemished professional record and reputation, pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendants' illegal hostile work environment.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990**
**42 U.S.C. §12101, *et seq.* AND ADA AMENDMENTS ACT OF 2008,**
**42 U.S.C. §12101, *et seq.***
**DISCRIMINATORY DISCHARGE**

98.     Plaintiff realleges by reference each and every allegation contained in the above Paragraphs and incorporates the same herein.

99.     Plaintiff is within the ADA's protected class pursuant to 42 U.S.C.

§ 12102 because he has physical and mental impairments that substantially limit his ability to engage in at least one daily activity; he has a record of such impairment; and he was, at all times relevant, perceived by Defendant Sealy and its managers, supervisors, and employees to have such an impairment.

100.    Plaintiff was qualified to perform the essential functions of his job with or without reasonable accommodation.

101.    Plaintiff was reprimanded and discharged by Defendant Sealy, as described above.

22

102.    Plaintiff's work performance was not "poor," as alleged by Defendants in the written disciplinary coaching, in the fabricated allegations, in the negative annual performance review he received, and/or in Defendants' explanation to Plaintiff of the reasons for his termination, as alleged above, and Sealy's decision makers in regard to his termination were aware of this.

103.    Defendant purported to terminate Plaintiff because of his alleged "poor performance," which was fabricated, false and baseless. In fact, "poor performance" was alleged as a pretext for termination. Plaintiff's termination was actually an act of retaliation and discrimination based on disability, as well as continuing discrimination based on Plaintiff's race, ethnicity, and national origin.

104.    Plaintiff was unlawfully terminated by Defendants because he has physical and mental impairments that substantially limit his ability to engage in at least one daily activity; he has a record of such impairment; and he was, at all times relevant, perceived by Defendant Sealy and its managers, supervisors, and employees to have such an impairment that directly resulted from Defendants forcing him to perform two jobs.

105.    Plaintiff was terminated on June 28, 2019, while he was on work restrictions and needed accommodation for his disability.  Plaintiff returned to work on June 10, 2019 after about two and half months of medical leave, and immediately thereafter, he was terminated on the pretext of "poor performance."

106.    As a direct and proximate result of  unlawful termination of Plaintiff by reason of his actual and perceived disability, he incurred damages including, but not limited to, lost income and benefits, humiliation, loss of enjoyment of life, emotional

23

distress, damage to his previously unblemished professional record and reputation, and other pecuniary and non-pecuniary losses. These damages would not have been incurred but for Defendants' unlawful termination.

### SIXTH CAUSE OF ACTION
### AMERICANS WITH DISABILITIES ACT OF 1990
### 42 U.S.C. §12101, *et seq.* AND ADA AMENDMENTS ACT OF 2008,
### 42 U.S.C. §12101, *et seq.*
### RETALIATION AND RETALIATORY DISCHARGE

107.   Plaintiff realleges by reference each and every allegation contained in the above Paragraphs and incorporates the same herein.

108.   Defendants' acts, detailed above, effectively deprived Plaintiff of equal employment opportunities as an employee. This deprivation was an act of retaliation for his complaints of discrimination in violation of the ADA and ADAAA, among other well-founded allegations.

109.   Plaintiff engaged in activities protected by the ADA by complaining to Defendants, including to Sealy's supervisors and managers, about the harassment, discriminatory practices, and hostile work environment he experienced because of his actual and perceived disability, as described herein, by opposing said practices and conditions.

110.   Plaintiff's exercise of protected rights was known to Defendants because the complaints were made to Sealy and to Sealy's decision makers.  All Defendants were made aware of the complaints prior to his termination and prior to such other retaliatory acts.

111.   Plaintiff's work performance was not "poor," as alleged by Defendants in the written disciplinary coaching, in the fabricated allegations, in the negative annual

performance review which he received, and/or in Defendants' explanation to Plaintiff of the reasons for his termination, as alleged above, and Sealy's decision makers in regard to his termination were aware of this.

112. Defendant purported to terminate Plaintiff by reason of his alleged "poor performance," which was fabricated, false and baseless. In fact, poor performance was a pretext to terminate Plaintiff, the real motive being retaliation and discrimination based on disability, among other discriminatory motives.

113. As a direct and proximate result of unlawful termination of Plaintiff because of his perceived disability, he incurred damages including but not limited to lost income and benefits, humiliation, loss of enjoyment of life, emotional distress, damage to his 29 years unblemished professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendants' unlawful termination.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**
**29 U.S.C. §794 *et seq.***

114. Plaintiff realleges by reference each and every allegation contained in the above Paragraphs and incorporates the same herein.

115. Section 504 of the Rehabilitation Act of 1973 (hereinafter "Rehabilitation Act") provides in relevant part: "[N]o otherwise qualified person with a disability…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance…" 29 U.S.C. § 794.

116.    Plaintiff is otherwise qualified to participate in the services, programs, or activities that are provided to individuals by federal financial assistance. *See* 29 U.S.C. § 794(b).

117.    Defendant Sealy is a direct recipient of federal financial assistance sufficient to invoke the coverage of Section 504 of the Rehabilitation Act and has received such federal assistance at all times relevant to the claims asserted in this Complaint.

118.    Defendant Sealy and its agents and employees have violated the Rehabilitation Act and the regulations promulgated thereunder by excluding Plaintiff from participation in, denying Plaintiff the benefits of, and subjecting Plaintiff, because of his disability, to discrimination for the reasons set forth above.

119.    Defendant Sealy committed the acts and omissions alleged herein with intent and/or reckless disregard of Plaintiff's rights.

120.    As a direct and proximate result of the aforementioned acts, Plaintiff has suffered and continues to suffer pecuniary losses, humiliation, hardship, and anxiety, due to the Defendant Sealy's failure to address accommodations, modifications, services and access required for Plaintiffs' disabilities.

## EIGHTH CAUSE OF ACTION
## NORTH CAROLINA COMMON LAW
## WRONGFUL DISCHARGE

121.    Plaintiff realleges by reference each and every allegation contained in the above Paragraphs and incorporates the same herein.

122. Plaintiff worked for Sealy from approximately April 14, 2016 to June 28, 2019, more than three years. For approximately the first two years and seven months, there were no complaints against Plaintiff whatsoever.

123. Plaintiff was wrongfully terminated on June 28, 2019.

124. Plaintiff's wrongful discharge occurred in violation of North Carolina common law and the public policies announced in N.C. Gen. Stat. § 143-422.2.

125. N.C. Gen. Stat. § 143-422.2 states, in relevant part:

It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of **race**, religion, color, **national origin**, age, sex or **handicap** by employers which regularly employ 15 or more employees (*Emphasis added*).

126. The right to be free from discrimination based on disability or "handicap" in the workplace is the public policy of North Carolina, supported by robust common law.

127. The right to be free from discrimination based on race or national origin in the workplace is also the public policy of North Carolina, supported by robust common law.

128. These public policies are applicable at the time of Plaintiff's wrongful termination.

129. Plaintiff was and is a member of protected categories by reason of his race, national origin, and disability as alleged herein.

27

130. Defendants' motivation for terminating Plaintiff violated North Carolina's public policy against discrimination based on race, national origin, and disability in the workplace.

131. Because of his wrongful termination, Plaintiff incurred damages including, but not limited to, lost income and benefits, humiliation, loss of enjoyment of life, emotional distress, damage to his previously unblemished professional record and reputation, and other pecuniary and non-pecuniary losses.

**NINTH CAUSE OF ACTION**
**VIOLATION OF THE RETALIATORY EMPLOYMENT DISCRIMINTATION**
**ACT, N.C. GEN. STAT. § 95-240, *et seq.***

132. Plaintiff realleges by reference each and every allegation contained in the above Paragraphs and incorporates the same herein.

133. This claim is brought pursuant to a right to sue letter issued by the Northa Carolina Department of Labor on December 17, 2019. This action is timely brought within 90 days of the letter's issuance.

134. The North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-240, *et seq.*, states that "No person shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to do" certain things, including filing a worker's compensation claim.

135. As previously stated throughout this Complaint, whenever Plaintiff spoke out against the unfair increase in this work assignments and the health problems this was causing for him, the Defendants responded by ignoring his complaints, increasing his workload, or taking other adverse actions against him.

136.    In November, 2018, Plaintiff informed his supervisor, Mr. Havaich, that he planned to submit a worker's compensation claim with the help of a lawyer. Immediately thereafter, Mr. Havaich again increased Plaintiff's workload, this time by forcing him to perform work that involved heavy lifting of mattresses weighing up to 300 pounds on the packaging line, which Plaintiff had never before been assigned to do. This work was also not part of the responsibilities outlined in Plaintiff's job description and presented a health hazard, as the used mattresses he was forced to handle were often contaminated with mold, blood, urine, dirt, or other harmful substances.

137.    As Plaintiff continued to be forced to perform hazardous, difficult work that was not part of his job description, he was injured by a rusted staple and his mental disability worsened. Plaintiff needed medical treatment for his wound, including a tetanus shot and antibiotics, which caused him further physical illness.

138.    During this time, the other engineers reporting to Plaintiff did not experience an increase in workload or expanded duties beyond their job descriptions, even though the other engineers are significantly younger than Plaintiff and would be better able to complete the strenuous physical work assigned to Plaintiff. This indicates a retaliatory motive behind Mr. Havaich's actions toward Plaintiff.

139.    Mr. Havaich also issued an adverse employment review of Plaintiff for the year 2018, which was submitted in March, 2019. Likewise, the Performance Improvement Plan was issued after Plaintiff's supervisors were made aware of his intention to submit a worker's compensation claim.

29

140.    Ultimately, the retaliation Plaintiff faced after submitting his worker's compensation claim culminated in termination.

141.    Because of the retaliatory actions perpetrated by the Defendants, Plaintiff incurred damages including, but not limited to, lost income and benefits, humiliation, loss of enjoyment of life, emotional distress, damage to his previously unblemished professional record and reputation, and other pecuniary and non-pecuniary losses.

<u>**TENTH CAUSE OF ACTION**</u>
**NORTH CAROLINA COMMON LAW**

142.    The Plaintiff realleges by reference each and every allegation contained in the above Paragraphs and incorporates the same herein.

143.    The Defendants repeatedly and relentlessly assigned an unreasonable workload to Plaintiff which was outside of his job description, and medical restrictions based upon his disability, without participating in an interactive process.  Additionally, the Defendants repeatedly discriminated against the Plaintiff based upon his above-mentioned protected classes and unlawfully termin him for same.  This extreme, willful, intentional and outrageous conduct is blatantly contrary to the public policy of North Carolina.

144.    This was done with the specific intent of causing distress to Plaintiff.

145.    As indicated by Plaintiff's record of psychological distress resulting from Defendants' behavior, this activity did in fact result in significant emotional distress to Plaintiff, to the point that he developed disabling mental conditions.

146.    Plaintiff incurred damages as a result of Defendants' actions calculated to cause Plaintiff emotional distress including, but not limited to, humiliation, loss of enjoyment of life, emotional distress, and other pecuniary and non-pecuniary losses.

## **MANDATORY RECOVERY OF ATTORNEY FEES AND COSTS**

147.    Plaintiff incorporates by reference all previous paragraphs as if fully set forth herein.

148.    Plaintiff is entitled to recover attorney's fees and costs pursuant to provisions of Title VII and the Americans with Disabilities Act.

## **JURY DEMAND**

149.    Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Ajit "Bobby" Sood respectfully requests that this Court:

A.    Declare that the acts, practices, and omissions complained of herein are illegal and violate Title VII, the Civil Rights Act of 1991, the ADA, the ADAAA, and North Carolina common law;

B.    Order Defendants to institute and carry out policies, practices, programs, and training which provide equal employment opportunities for employees who are disabled, and which eradicate the effects of Sealy's past and present illegal employment practices;

C.    Award to Plaintiff compensatory damages to fully compensate him for the loss of pay, pain and suffering, past and future economic and non-economic losses,

consequential losses, extreme emotional distress, and past and future medical expenses resulting from Defendants' discriminatory conduct alleged herein;

     D.    Direct Defendants to pay Plaintiff his past and future pecuniary losses resulting from the illegal conduct and practices complained of herein, including back pay and front pay;

     E.    Award damages for loss of reputation;

     F.    Award to Plaintiff exemplary and/or punitive damages in an amount to be shown at trial;

     G.    Award to Plaintiff reasonable attorneys' fees and costs, including expert witness fees;

     H.    Award to Plaintiff interest on any awards at the rate allowed by law; and

     I.    Award such additional relief as justice may require.

Respectfully submitted on this, the 21st day of December, 2019.


                    KING LATHAM LAW, PLLC


                    /s/ Roberta King Latham
                    Roberta King Latham
                    N.C. Bar No. 30717
                    615 Saint George Square Court, Suite 300
                    Winston Salem, North Carolina 27103
                    Telephone: (336) 419-1151
                    Facsimile: (336) 770-2803
                    roberta@kinglatham.com



                    /s/ Shellie L. Bryant
                    Shellie L. Bryant
                    N.C. Bar No. 55059
                    615 Saint George Square Court, Suite 300
                    Winston Salem, North Carolina 27103
                    Telephone: (336) 419-1151
                    Facsimile: (336) 770-2803
                    shellie@kinglatham.com