IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

AJIT "BOBBY" SOOD,              )
                               )
              Plaintiff,       )
                               )
         v.                    )        1:19-cv-01248
                               )
TEMPUR  SEALY  INTERNATIONAL,  )
INC., a Kentucky Corporation   )
                               )
              Defendant.       )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Before the court is the motion of Defendant Tempur Sealy International, Inc. ("Temper Sealy") to dismiss in part Plaintiff Ajit "Bobby" Sood's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 18.) Sood brings eight separate claims stemming from his employment with Tempur Sealy. Tempur Sealy moves to dismiss claims three, seven, and eight, which allege respectively: (1) hostile work environment based on disability status in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.; (2) retaliation for filing a worker's compensation claim in violation of the Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-240, et seq. (2020); and (3) intentional infliction of emotional distress. For the reasons set forth below, the motion will be granted in part and denied in part.

## I. BACKGROUND

Sood's complaint contains the following factual allegations, which are viewed in the light most favorable to him:[1]

On April 2, 2016, Sood interviewed for a job as a Senior Product Engineer ("SPE") with Tempur Sealy. (Doc. 17 ¶ 24.) Shortly thereafter, he began working there as an independent contractor. (Id.) On March 17, 2017, he was hired as a full-time SPE employee and given a significant raise. (Id. ¶ 25.) In that position, Sood reported to Cody Havaich. (Id. ¶ 27.)

On March 31, 2018, a Senior Quality Engineer ("SQE") retired. (Id.) Rather than hiring a replacement SQE, Tempur Sealy transferred the SQE duties to Sood. (Id.) From that time on, unlike other engineers, Sood was charged with performing the functions of both the SPE and the SQE. (Id. ¶¶ 27, 28.) According to Sood, he was given this increased workload based his Indian national origin (id. ¶¶ 28, 29), whereas Caucasian and American engineers were not assigned additional job duties (id.). In his SQE role, Sood reported to Gary Ford. (Id. ¶ 27.)

Sood's doubled workload caused him significant physical and emotional stress, fatigue, and exhaustion. (Id. ¶ 30.) In addition to his increased workload, he was required to attend training, conferences, and seminars every Tuesday during his lunch

---

[1] The facts set out here are those relevant only to the three claims under consideration.

2

break.  (Id. ¶ 35.)  As had occurred throughout Sood's employment, his supervisor, Havaich, frequently called, texted, and emailed regarding work outside of business hours, even when Sood was on leave.  (Id. ¶ 52.)  When Sood did not reply or failed to answer immediately, Havaich would get angry.  (Id.)

On October 15, 2018, Sood went to Richard Herber, M.D., for a medical exam.  (Id. ¶ 39.)  Doctor Herber determined that "Sood may return to light duty immediately with the following restrictions: Please reduce the workload stress for this patient. He has a medical condition that has [sic] can be seriously impacted and could worsen if patient's stress is high."  (Id.)  On October 24, 2018, Dr. Herber reiterated these recommendations and added that, as part of Sood's reduced workload, Sood should not be required to lift items weighing over twenty pounds for thirty days. (Id. ¶ 40.)  He also advised that Tempur Sealy should "hire another person to relieve the work load [sic] of both position [sic]." (Id.)

After informing Havaich of Dr. Herber's recommendations, and despite Soods's medical restrictions, Havaich had Sood unload, pack, and lift heavy mattresses without assistance.  (Id. ¶¶ 41, 42.)  These duties were not part of Sood's job description, Sood had never been assigned such work previously, and no other engineers were given similar duties.  (Id. ¶¶ 135-37.)  Due to this work, Sood suffered additional injuries, including a wound

3

that required a tetanus shot and antibiotics. (Id. ¶ 43.)

On multiple occasions, Sood requested that Havaich provide him with reasonable accommodations in the form of reduced workloads. (Id. ¶ 31.) These requests were disregarded. (Id.)

In November 2018, Sood informed Havaich that he intended to file a worker's compensation claim relating to his injury, work, and resulting illness. (Id. ¶ 45.) After receiving this news, Havaich further increased Sood's workload. (Id.)

On November 26, 2018, Dr. Herber recommended that Sood's work restrictions continue for an additional thirty days. (Id. ¶ 44.) Yet, on November 30, 2018, Human Resources Manager Sarah East reprimanded Sood for failing to perform his job duties, citing errors on three specific projects. (Id. ¶ 46.) The allegations in the reprimand were false, and the errors listed were attributable to Havaich. (Id. ¶¶ 49, 50.) One of these errors occurred in February 2018, over nine months earlier. (Id. ¶ 47.)

At some point after November 2018, Sood went on leave due to his disabilities. (See id. at ¶ 53.) His doctor permitted him to return to work on January 16, 2019. (Id.) On February 13, 2019, Sood emailed East stating that, despite his recovery from work-related injury and illness, he was still assigned job duties intended for two employees and his stress level had not decreased. (Id. ¶ 55.)

On March 6, 2019, Sood filed complaints with the Equal

4

Employment Opportunity Commission and the North Carolina Department of Labor based on what he perceived as harassment and hostility. (Id. ¶¶ 56, 57.) The next day he informed East that he had filed those complaints. (Id.) On March 8, East put Sood on a Performance Improvement Plan ("PIP") which warned him of the need to improve his performance as SQE. (Id. ¶¶ 58, 59.) The PIP provided a sixty-day window for improvement. (Id. ¶ 66.) During his 2018 performance evaluation, upon which the PIP was based, there were no complaints about his performance as SPE. (Id. ¶ 59.)

Sood met with Havaich and argued that the PIP was based on false claims and was retaliatory. (Id. ¶ 60.) Havaich promised to withdraw the PIP, but never did. (Id.; Doc. 20 at 10, n. 2.)

On March 20, 2019, Sood suffered another occupational injury while tearing down used, hazardous mattresses at an event in Kansas City. (Doc. 17 ¶ 61.) Against East's directions, Havaich provided no help to Sood during this event. (Id. ¶ 62.) Afterwards, Havaich reprimanded, yelled, and cursed at Sood for his performance at the event. (Id.) At the time, Sood was suffering gastrointestinal symptoms and anxiety due to stress. (Id. ¶ 61.)

In an email dated March 23, 2019, Havaich stated that Sood was "on pace" for his April 1 deliverables. (Id. ¶ 60; Doc. 17-6.)

Four days later, on March 27, Dr. Herber ordered Sood to limit

5

himself to light duty. (Doc. 17 ¶ 63.) On March 28, Sood was examined by a psychiatrist, who declared Sood fully disabled and recommended that he be released from work due to work-related illness. (Id.) Based on these recommendations, Sood did not work from March 28, 2019, to June 10, 2019. (Id.) On June 13, 2019, Sood was threatened with termination based on "poor performance." (Id. ¶ 64.) He was fired on June 28, 2019. (Id. ¶ 65.) From the time East had issued the PIP, Sood had worked only 38 days. (Id. ¶ 66.)

## II. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94

6

(2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor. Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). "Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegation 'to raise a right to relief above the speculative level' so as to 'nudge[] the[] claims across the line from conceivable to plausible.'" Sauers v. Winston-Salem/Forsyth Cty. Bd. Of Educ., 179 F. Supp. 3d, 544, 55 (M.D.N.C. 2016) (alteration in original) (quoting Twombly, 550 U.S. at 555). "[T]he complaint must 'state[] a plausible claim for relief' that permit[s] the court to infer more than the mere possibility of misconduct based upon 'its judicial experience and common sense.'" Coleman v. Md. Ct. App., 626 F.3d 187, 190 (4th Cir. 2010) (alterations in original) (quoting Iqbal, 556 U.S. at 679). Thus, mere legal conclusions are not accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

### B. Hostile Work Environment Under the ADA

The ADA mandates that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This language creates a cause of action for hostile work

7

environment.  Fox v. Gen. Motors Corp., 247 F.3d 169, 175 (4th Cir. 2001).  The hostile work environment provisions of the ADA are modeled after those of Title VII, and "courts have routinely used Title VII precedent in ADA cases."  Id. at 176.  To state a claim for hostile work environment, a plaintiff must show (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer.  Id. at 177.  "The words 'hostile work environment' are not talismanic, for they are but a legal conclusion; it is the alleged facts supporting those words, construed liberally, which are the proper focus at the motion to dismiss stage."  Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003).

Tempur Sealy argues that this claim should be dismissed because Sood has failed to plausibly allege that the harassment was based on his disability and that the harassment was objectively severe or pervasive.  (Doc. 19 at 6–8; Doc. 21 at 2–5.)  Both contentions will be addressed in turn.

### 1. "Based On" Plaintiff's Disability

To demonstrate that harassment is "based on" a disability, a plaintiff must show that "but for" the employee's disability, he

8

or she would not have been the victim of the discrimination. Pueschel v. Peters, 577 F.3d 558, 565 (4th Cir. 2009) (citing Jennings v. Univ. of N.C., 482 F.3d 686, 723 (4th Cir. 2007)); see also Gentry v. E.W. Partners Club Mgmt. Co., 816 F.3d 228, 234–36 (4th Cir. 2016) (declining to extend Title VII's "motivating factor" standard to the ADA). "The critical issue for consideration in the 'because of' inquiry is whether a disabled plaintiff has been 'exposed to disadvantageous terms or conditions of employment to which [non-disabled employees] are not exposed.'" Mason v. Wyeth, Inc., 183 Fed. App'x 353, 361 (4th Cir. 2006) (alteration in original) (quoting Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc)).

Sood points to the following facts to establish that he was subjected to a hostile work environment: he was forced to perform all duties of a co-worker who retired in addition to his own preexisting duties (Doc. 17 ¶ 27); he was reprimanded based on false allegations by East in November 2018 (id. ¶¶ 46, 49); he was yelled and cursed at for failing to perform job duties that he was not assigned (id. ¶ 62); his supervisors consistently ignored and disregarded his doctor's recommendations, including by forcing him to lift heavy objects despite medical restrictions, about which he complained (id. ¶¶ 41–42, 90); his supervisor called, texted, and emailed him outside of work hours (id. ¶ 52); he did not receive a lunch break each Tuesday because he was placed in mandatory

9

training from 11:30a.m. to 1:00 p.m. (id. ¶ 35); he was issued a PIP without justification (id. ¶¶ 58-60); and he was terminated without justification (id. ¶¶ 64, 65). Sood alleges that all of the above actions "either contributed to or occurred in response to [his] disabled status." (Doc. 20 at 10.)

To the extent that Sood argues that Tempur Sealy's actions "contributed to" his disability, these claims fail. In a hostile work environment claim, the ADA prohibits harassment that is *based on* an individual's disability, not harassment that causes a disability. See 42 U.S.C. § 12112(a). With this in mind, at least three of Sood's allegations occurred before any claim of disability arose in October 2018 (Doc. 17 ¶¶ 38-40), specifically: his increased workload, which began in January 2018[2] (id. ¶ 27); his supervisor contacting him outside of work hours, which occurred "throughout [his] employment with Defendant" (id. ¶ 52); and his mandatory Tuesday trainings, which began on or before July 17, 2018 (see Doc. 17-2). As these instances occurred before his disability arose or was known, Tempur Sealy's actions could not have been based on Sood's disability.

Of his remaining claims, Sood specifically alleges that East's reprimand on November 30, 2018, and his termination in June

---

[2] Further, Sood himself claims that he was assigned these additional job duties based on racial stereotypes, not based on his disability. (Id. ¶¶ 28-31; Doc. 20 at 10.)

10

2019 were based on his disability. (See Doc. 17 ¶¶ 46-50 (indicating that he was reprimanded for an error that occurred in February 2018 "only after he suffered his work-related injury in October 2018" and that the "reprimand was issued to create groundwork to terminate Plaintiff because of his disabilities, ethnicity, national origin, and ancestry"); Doc. 20 at 10.) There are certain additional allegations that are sufficiently connected to his disability that, for the purposes of the present motion, they can be reasonably inferred to be based on his disability. Specifically, Sood alleges that Tempur Sealy ignored his requests for reasonable accommodation and that shortly after becoming aware of his disability, it forced him to perform work that was outside his job description, against medical recommendations, and to which no other engineer was assigned. For each of these instances, Sood has stated facts sufficient to support that the alleged harassment would not have occurred but-for his being disabled. As such, he has plausibly alleged that at least some of the harassment he experienced was based on his disability.

### 2. **Severe or Pervasive Harassment**

"[P]laintiffs must clear a high bar in order to satisfy the severe or pervasive test." Equal Emp't Opportunity Comm'n v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008) (distinguishing actionable "hostile work environment" from mere "rude treatment by coworkers, ... callous behavior by one's

11

supervisor, ... or a routine difference of opinion and personality conflict with one's supervisor") (internal citations omitted). A "merely unpleasant working environment" does not suffice. Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996). To prevail, a plaintiff must establish that the work environment was both subjectively and objectively hostile. Fox, 247 F.3d at 178. In deciding whether an environment is objectively hostile, courts consider the frequency and severity of the discriminatory conduct, whether it unreasonably interfered with the plaintiff's work performance, and whether it was physically threatening or humiliating, or merely consisted of offensive utterances. Id. Considering the totality of the circumstances, a hostile workplace is one so "permeated with 'discriminatory intimidation, ridicule, and insult'" it "alter[s] the conditions of the victim's employment and create[s] an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-65 (1986)). Ultimately, whether "harassment [is] sufficiently severe or pervasive is quintessentially a question of fact." Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir. 1994) (quoting Paroline v. Unisys Corp., 879 f.2d 100, 105 (4th Cir. 1989)).

Having considered the claims of harassment that are allegedly based on Sood's disability, it must be determined whether that harassment was sufficiently severe or pervasive to constitute a

12

hostile work environment. Although Sood does not allege any facts showing threats, humiliation, or offensive utterances based on his disability, he plausibly alleges that the harassment he experienced was frequent, pervasive, physically harmful, and interfered with his ability to perform his job. See Bluey v. Charles Cty., MD, No. CV DKC 19-3163, 2020 WL 5203334, at *10 (D. Md. Sept. 1, 2020) (finding harassment to be pervasive and frequent where, in a six-month period, a disabled employee was groundlessly reprimanded, requests for reasonable accommodation were repeatedly denied or ignored, the employee was forced to take unpaid leave, and the employee was subjected to arbitrary medical exams and documentation requirements); Fox, 247 F.3d at 179 (finding harassment to be physically harmful where supervisors aggravated an employee's back injury by requiring him to perform tasks that were too physically demanding).

Here, Sood alleges that in the six-month period after his disability arose, he was repeatedly forced to perform job duties against medical recommendations and, in doing so, sustained multiple injuries. Despite repeated requests for reasonable accommodation throughout that time, he alleges, his work situation remained the same and caused his mental and physical health to further deteriorate. Due to his deteriorating health, he was placed on medical leave at least twice. In that same six-month period, he was given at least three unwarranted reprimands, placed

13

on a PIP, and ultimately terminated in June 2019, less than three weeks after he returned from medical leave. "These allegations, all occurring within a sufficiently short period of time, are sufficiently pervasive and serve to form a plausible claim for a hostile work environment. If taken independently they may seem like 'isolated personnel decisions.'" Bluey, 2020 WL 5203334, at *11 (quoting Pueschel, 577 F.3d at 566). And ordinarily these allegations do not alone constitute an actionable hostile work environment claim. However, when viewed collectively and construed liberally (as the court must at the motion to dismiss stage), the allegations plausibly state a claim for a hostile work environment. Indeed, Sood need not make a *prima facie* case of hostile work environment at the pleadings stage but merely state a plausible claim. McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 584 (4th Cir. 2015) (quoting Swierkiewicz v. Sorema N. A., 534 U.S. 506, 510, 515 (2002)). It remains to be shown what facts Sood may be able to prove to ultimately prevail on this claim.

Tempur Sealy's motion to dismiss claim three of the amended complaint will be denied.

### C. REDA

N.C. Gen. Stat. § 95-241(a) (2020) provides that "[n]o person shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to

14

... [f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to ... Chapter 97 of the General Statutes," the Workers' Compensation Act, N.C. Gen. Stat. § 97-1 (2020) et seq. "In order to state a claim under REDA, a plaintiff must show (1) that he exercised his rights as listed under N.C. Gen. Stat. § 95-241(a), (2) that he suffered an adverse employment action, and (3) that the alleged retaliatory action was taken because the employee exercised his rights under N.C. Gen. Stat. § 95-241(a)." Wiley v. UPS, Inc., 594 S.E.2d 809, 811 (N.C. Ct. App. 2004) (citation omitted). An adverse action includes "the discharge, suspension, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the terms, conditions, privileges, and benefits of employment." N.C. Gen. Stat. § 95-240(2) (2020). "If plaintiff presents a *prima facie* case of retaliatory discrimination, then the burden shifts to the defendant to show that he 'would have taken the same unfavorable action in the absence of the protected activity of the employee.'" UPS, Inc., 594 S.E.2d at 811 (quoting N.C. Gen. Stat. § 95-241(b)).

In the present case, it is undisputed that Sood meets elements one and two. The parties agree that he has properly exercised his rights by filing a workers' compensation claim and he suffered an adverse employment action, at minimum, in the form of his

15

termination. Sood argues that he suffered additional adverse employment actions based on the PIP, his supervisors' unwarranted reprimands, and the assignment of more difficult job duties. (Doc. 17 ¶¶ 134-39.) Defendants, relying primarily on Title VII precedent relating to discrimination claims, contend that those activities do not constitute adverse employment actions as a matter of law. (Doc. 19 at 8, 9.)

Title VII, to which courts may refer for guidance in REDA cases, Smith v. Comput. Task Grp., Inc., 568 F. Supp. 2d 603, 614 n.12 (M.D.N.C. 2008), applies a broader standard to its anti-retaliation provision than that applicable to its anti-discrimination provision. Strothers v. City of Laurel, MD, 895 F.3d 317, 327 (4th Cir. 2018). Unlike discriminatory actions, retaliatory actions need not "affect the terms and conditions of employment" to constitute an adverse employment action. Id. Retaliatory actions need only be "materially adverse" such that they "'might have dissuaded a reasonable worker' from engaging in protected activity." Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62-64 (2006)). Under this broader standard, at least some of the acts short of termination — in particular, the PIP — may constitute adverse employment actions. See, e.g., Monroe v. BellSouth Telecomm., Inc., No. Civ. 102CB00591, 2003 WL 22037720, at *5 (M.D.N.C. Aug. 15, 2003)(considering a warning from an HR Manager to be an adverse

16

employment action against an employee at least "[i]n that it was one of the steps in the process to terminate" him); Bumgardner v. Spotless Ent., 287 F. Supp. 2d 630, 636 (W.D.N.C. 2003) (finding an employee suffered an adverse employment action where he was "counseled" and warned by a supervisor that, if he called the EPA, he would be fired); see also Johnson v. Trs. of Durham Tech. Cmty. Coll., 535 S.E.2d 357, 362 (N.C. Ct. App. 2000) (noting the General Assembly defined retaliatory action broadly). As such, Sood has adequately alleged the first two elements of a REDA claim. However, the parties disagree as to whether Sood has sufficiently alleged that the adverse employment actions were taken *because* he exercised his protected rights.

Evidence of retaliation in REDA cases is often circumstantial. UPS, Inc., 594 S.E.2d at 811. However, "the causal nexus between protected activity and retaliatory discharge must be something more than speculation." Id. In the absence of direct evidence of retaliation, see, e.g., Tarrant v. Freeway Foods of Greensboro, Inc., 593 S.E.2d 808, 813 (N.C. Ct. App. 2004), North Carolina courts infer retaliation where there is a "close temporal connection between the plaintiff instituting a charge" and the adverse employment action. Shaffner v. Westinghouse Elec. Corp., 398 S.E.2d 657, 659 (N.C. Ct. App. 1990); see also Wiley v. United Parcel Serv., Inc., 102 F. Supp. 2d 643, 651 (M.D.N.C. 1999). While there is no precise time period required for a "close

17

temporal connection," courts have found a time period of approximately one month to be acceptable, see Martin v. Nationwide Mut. Ins. Co., No. 1:99CV00956, 2001 WL 604192, at *9-10 (M.D.N.C. Apr. 20, 2001), while ninety days has been deemed too long, see Wilkerson v. Pilkington N. Am., Inc., 211 F. Supp. 2d 700, 707 (M.D.N.C. 2002) (citing Shaffner, 398 S.E.2d at 657). In addition to temporal proximity, courts allow plaintiffs to introduce reasonable inferences of a causal connection between the protected activity and the termination. Smith, 568 F. Supp. 2d at 615-16.

Here, Tempur Sealy correctly points out that more than ninety days elapsed between Sood's filing of his workers' compensation claim and his termination. (Doc. 19 at 10.) Relying on Shaffner, it argues that, as a matter of law, this time period is too long to infer retaliation. However, the present case is distinguishable. First, unlike the plaintiff in Shaffner, Sood was not consistently working at the company throughout those ninety days. In fact, he was on medically-required leave for most of that time, having been found to be fully disabled. He ultimately worked fewer than 40 days after the filing of his claim before he was terminated. Second, and more importantly, he arguably suffered his first adverse employment action — being placed on a PIP — only one day after informing East of his workers' compensation claim. As discussed above, the PIP could be considered an adverse employment action at least in that it was "one of the steps in the

18

process to terminate" Sood.  See Monroe, 2003 WL 22037720, at *5.
As only one day had passed between informing East of the workers'
compensation claim and Sood's placement on the PIP, the facts as
alleged make plausible a "close temporal connection" between the
exercise of Sood's rights and the adverse employment action.

Further, even if Sood's placement on a PIP did not in itself
constitute an adverse employment action, the timing of this action
can support a reasonable inference of a causal connection between
the claim and Sood's ultimate termination.  That he was put on the
PIP one day after he informed East of his claim and the PIP gave
him a window of only 60 days for improvement is some evidence of
a causal connection between his workers' compensation claim and
his termination 38 working days later, such that dismissal on these
grounds would be inappropriate.

As Sood has plausibly alleged a REDA violation, the motion to
dismiss claim seven of the amended complaint will be denied.

### D.  Intentional Infliction of Emotional Distress

Tempur Sealy also moves to dismiss Sood's claim for
intentional infliction of emotional distress.  (Doc. 18.)  Under
North Carolina law, the essential elements of this tort are "(1)
extreme and outrageous conduct, (2) which is intended to cause and
does cause (3) severe emotional distress to another."  Dickens v.
Puryear, 276 S.E.2d 325, 335 (N.C. 1981); accord Simmons v. Chemol
Corp., 528 S.E.2d 368, 371 (N.C. Ct. App. 2000).  "The tort may

19

also exist where defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress." Dickens, 276 S.E.2d at 335. Here, Tempur Sealy argues that none of the alleged conduct was sufficiently extreme and outrageous to satisfy the first element and asserts that Sood has not suffered severe emotional distress, as required under the third element. (Doc. 19 at 11–14.)

"Whether or not conduct constitutes extreme and outrageous behavior is initially a question of law for the court." Simmons, 528 S.E.2d at 372. "Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Smith-Price v. Charter Behav. Health Sys., 595 S.E.2d 778, 782 (N.C. Ct. App. 2004) (internal quotation marks and citation omitted). "North Carolina courts rarely 'find conduct in the employment context that will rise to the level of outrageousness necessary to support a claim of intentional infliction of emotional distress.'" Smith, 568 F. Supp. 2d at 621 (quoting Thomas v. N. Telecomm., Inc., 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000)). The employment context includes retaliatory termination cases arising under REDA. Id.

Sood alleges that Tempur Sealy intentionally inflicted emotional distress upon him when his supervisors assigned him an

unreasonable workload, ignored his disability-based medical restrictions, discriminated against him based upon his protected status, and unlawfully terminated him due to his disabilities, race, ethnicity, and national origin. (Doc. 17 ¶ 142.) As a matter of law, this conduct does not rise to the level of extreme or outrageous conduct. Compare Dickens, 276 S.E.2d at 327, 336–37 (finding alleged conduct extreme and outrageous when defendants pointed pistol between plaintiff's eyes, beat him into semi-consciousness with nightsticks, and threatened him with castration), Brown v. Burlington Indus., Inc., 378 S.E.2d 232, 233–36 (N.C. Ct. App. 1989) (finding alleged conduct extreme and outrageous when employee's supervisor made sexually explicit remarks and gestures two to three times a week over an extended period of time), and Hogan v. Forsyth Country Club Co., 340 S.E.2d 116, 121–22 (N.C. Ct. App. 1986) (finding alleged conduct extreme and outrageous when supervisor engaged in unwanted sexual touching of plaintiff, screamed profanities at her when she refused his advances, threatened her with bodily injury, and pulled a knife on her), with Atkins v. USF Dugan, Inc., 106 F. Supp. 2d 799, 810–11 (M.D.N.C. 1999) (finding conduct not extreme or outrageous when employee was told he was "too old and sick" to handle his job and was allegedly terminated in violation of federal and state discrimination laws), Pardasani v. Rack Room Shoes Inc., 912 F. Supp. 187, 192 (M.D.N.C. 1996) (finding conduct not extreme and

outrageous when plaintiff alleged he was given poor performance evaluations, denied promotions available to others, excluded from training, and finally terminated from his employment), Thomas, 157 F. Supp. 2d at 635 (finding alleged conduct not extreme and outrageous where employer gave plaintiff excessive workload compared to coworkers, filed paperwork late causing her to lose disability benefits, and discharged her in retaliation for exercising her rights under Title VII), and Hogan, 340 S.E.2d at 122-23 (finding conduct not extreme or outrageous when co-employee screamed and shouted at plaintiff, called her names, and threw menus at her).

As Sood has failed to establish the requisite extreme and outrageous conduct, the court need not consider whether he has plausibly alleged having suffered severe emotional distress. Tempur Sealy's motion to dismiss claim eight of the amended complaint will therefore be granted.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Tempur Sealy's motion to dismiss (Doc. 18) will be GRANTED IN PART and DENIED IN PART as follows: the motion to dismiss claims three and seven will be DENIED, and the motion to dismiss claim eight will be GRANTED and claim eight is DISMISSED.

22

/s/   Thomas D. Schroeder
                                        United States District Judge

September 21, 2020